UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CELEBRITY FUND MANAGEMENT LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>- against -<br><br>HUMANS, INC. d/b/a FLIPFIT, a Delaware corporation<br><br>Defendant. | No.: 1:24-cv-5282<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Celebrity Fund Management LLC ("CFM" or "Plaintiff") by and through its undersigned counsel, Greenspoon Marder LLP, respectfully submits this Complaint against Defendant Humans, Inc. d/b/a FlipFit ("Flip" or "Defendant") and alleges as follows:

## INTRODUCTION

1. In the summer of 2020, Defendant Flip was an early-stage startup company looking to launch their product, a new social networking application, with a splash.

2. To make that splash, Flip's founders wanted to find celebrity influencers active on various social media networks (TikTok, Instagram, Facebook, YouTube, etc.) to partner with and promote their product. Accordingly, following an introduction, Flip eagerly sought a partnership with Plaintiff, owned by brothers Gil Eyal and Ori Eyal, who invest in startup companies and specialize in introducing and matching Celebrities and social media influencers with startup companies like Flip.

3. Gil Eyal, in particular, is well renowned in the world of social media influencers, having previously founded one of the early leading companies in the industry, and having won industry awards.

1

4. Plaintiff and Defendant ultimately solidified their relationship by signing a Services Agreement (the "Services Agreement') in August 2020. Attached hereto as Exhibit A is a copy of the Services Agreement. Because Flip was a startup with limited cashflow, the parties agreed CFM would be paid for its services through both the issuance of equity warrants and a contractual right for CFM to invest in Flip's next financing round.

5. CFM performed its end of the bargain, opening its extensive rolodex, working diligently to make valuable celebrity introductions to Flip, and then facilitating Flip's negotiations with those Celebrities. Flip reaped all the benefits of CFM's work but never granted CFM the benefits of the Services Agreement.

6. CFM now files this action to collect on the contractual promises made by Flip in the Services Agreement.

## NATURE OF THE ACTION

7. This is a breach of contract action concerning equity positions owed by Flip to CFM pursuant to the Services Agreement. Under that Agreement, Flip owed CFM an equity position in Flip—an equity position that is now worth tens of millions of dollars.

8. Accordingly, this action seeks to remedy Flip's many implied and express breaches of the Services Agreement by providing CFM either with the equity position it is owed, or the fair market value of that equity position.

## THE PARTIES, JURISDICTION, AND VENUE

9. This Court has personal jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) complete diversity of citizenship exists, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Plaintiff Celebrity Fund Management LLC is a limited liability company organized under the laws of the State of Delaware.

11. Plaintiff has two members: Gil Eyal, a citizen of the state of New Jersey, where he resides, and Ori Eyal, a citizen of Israel, where he resides.

12. Defendant Humans, Inc. is a corporation organized under the laws of the State of Delaware, with a principal place of business in California.

13. Moreover, Flip, in the subject Services Agreement, submitted to this Court's jurisdiction and agreed that "[v]enue for any and all disputes arising out of this Agreement shall be tried exclusively in the United States District Court for the Southern District of New York, or if such court lacks jurisdiction, a state court sitting in New York, New York." Exhibit A at ¶ 5.4. The Parties further provided consent and waived any objection to jurisdiction within any court located in New York, New York. *Id.*

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the parties consented to venue in the United States District Court for the Southern District of New York. *Id.*

## GENERAL ALLEGATIONS

**A. Flip Presses CFM to Begin its Work While the Parties are Negotiating but Before Executing the Services Agreement**

15. In the age of social media, celebrity-influencer marketing is one of most powerful tools for a startup business. The industry involves a brand collaborating with an online influencer to market its products or services.

16. Gil Eyal, one of the two members of CFM, has consistently been recognized as one of the leaders in the space, and a top 100 most influential individual in this industry, a list that includes the CEOs of Instagram, TikTok, and YouTube. As such, Mr. Eyal and CFM have built and maintain an extensive network of Celebrities, influencers, and their respective agents.

17. Seeking to capitalize on CFM's hard-earned connections, relationships, credibility, and experience in the space, Flip's founders, Nooruldeen Agha ("Agha") and Jonathan Ellman ("Ellman") reached out to CFM, through a mutual connection, for help launching their product, Flip App, which is a social media network that allows its users to shop for various brands and products on the App.

18. Shortly after their introduction to each other, on June 19, 2020, Agha sent an email to Gil Eyal, stating "I want to finalize celebrity plan and really want it to be with you." To entice Mr. Eyal to partner CFM with Flip, Agha boasted that Flip is "building one of the most complex businesses to ever exist and everything has to work at the time they should seamlessly, else it will all fail."

19. After that June 19, 2020 email, the Parties earnestly negotiated what would become the final Services Agreement. The Parties agreed on general terms on July 2, 2020, and on the same day CFM sent a proposed initial draft to Flip for review by Flip's counsel.

20. While Flip was reviewing the draft agreement, Flip pressed CFM to begin its work gathering Celebrities for introduction, with the goal to start immediately upon execution of the Services Agreement. CFM obliged, and on July 16, 2020, in response to an email sent by a Flip employee asking for an update about CFM's work progress, CFM stated that its outreach to TikTok influencers had gone live, and that CFM had already received positive responses.

21. Flip was in a hurry to receive the fruits of CFM's labor but was in far less of a hurry to finalize the Services Agreement, not sending back comments to the July 2, 2020 draft until July 29, 2020.

22. A week prior, on July 22, 2020, Agha emailed Gil Eyal asking for a call to iron out the parties' work process, key performance indicators ("KPIs"), and tasks for TikTok influencers, all under the yet-to-be finalized Services Agreement. In that same email, Agha noted to Mr. Eyal that Flip had agreed that CFM would introduce social media influencer Maddie Ziegler to Flip together with two other influencers. Agha further noted that he expected those introductions to have already occurred, even without a final contract in place.

23. Mr. Eyal responded by reminding Agha that, although he can begin the process of making introductions, he cannot set up meetings with Flip without first having a signed agreement.

24. Throughout the negotiations process, CFM continued to operate in good faith, and in fact confirmed in an email dated July 24, 2020 that CFM had already contacted Ms. Ziegler's mother/agent, and her agency's owner, who expressed an eagerness to meet Agha/Flip. Agha responded by exclaiming: "Now I am super excited."

25. Flip's counsel delivered a revised draft agreement to CFM on July 29, 2020, and the new draft contained an exhibit, drafted jointly by Agha and Mr. Eyal, that outlined the scope of work and value of each agreed-upon deliverable. These deliverables were broken into three

categories based upon the level of celebrity being introduced: a "main celebrity", "mid-sized celebrity", and "second-level celebrity." Flip named Maddie Ziegler as an example of a "main celebrity."

26. In a follow-up email exchange, Mr. Eyal sought confirmation from Agha that the equity owed to CFM under the agreement would vest upon completion of each stage in the attached exhibit as opposed to all at once upon completion of all stages. Mr. Agha confirmed as much in an email dated July 30, 2020, and promised to revise the draft agreement to reflect the Parties' mutual intention.

### B. The Final Services Agreement – Issuance and Vesting of Fund Warrants

27. The Parties executed a final Services Agreement on August 3, 2020, and the Agreement was made effective as of August 2, 2020.

28. Under Section 1.1 of the Services Agreement, CFM agreed to "use best efforts to provide the Services detailed in Exhibit 1.1 to this Agreement … during the Term … of the Agreement."[1]

29. CFM had been using its best efforts to provide such Services since June 19, 2020, based on the urging of Flip.

30. In exchange for CFM's best efforts to provide such Services, Flip agreed to provide CFM with two forms of compensation: 1) the issuance of a Fund Warrant; and 2) an option for CFM to make future investments in Flip.

31. With respect to the issuance of a Fund Warrant, Section 2.1 of the Services Agreement provided as follows:

---

[1] All capitalized terms not otherwise defined herein shall have the definitions contained within the Services Agreement.

> **2.1  Warrant Issuance.** The Company will issue warrants to the Fund (the "**Fund Warrant**") to purchase common stock calculated on a fully diluted basis (for the avoidance of doubt, assuming exercise or conversion of all outstanding vested and unvested options warrants and other convertible securities) representing 1.6% of the Company's share capital, to vest upon completion of the services described in **Exhibits 1.1A**, **1.1B**, and **1.1C**. The Fund Warrant will vest as detailed in the tiers of the Exhibits..

32. As to the vesting of the Fund Warrant, Section 2.1(b) stated:

> **(b)  Vesting.** The Fund Warrant shall become exercisable according to the terms of the Fund Warrant, including its Vesting and Acceleration provisions. Except if agreed differently in writing, the parties hereby agree that the stock warrants issued to the Fund shall be sole and sufficient consideration for the services provided by the Fund. Notwithstanding the aforesaid: The Fund Warrant shall vest upon the signing of a definitive agreement between the Company and a Main Celebrity (the "Definitive Agreement").

33. Consistent with the Parties' intent for the Fund Warrants to vest in stages as opposed to all-or-nothing, Exhibit 1.1 of the Services Agreement provided that "a specific equity amount is tied to each deliverable and is earned separately, assuming $1 million is equal to 1.6% equity."

34. Exhibit 1.1 also outlined the Services to be provided by CFM, and again, these Services were broken down into three categories depending on the popularity of the celebrity-influencer.

35. As to each category, CFM's obligations were twofold: 1) CFM shall introduce Flip to the celebrity, and "further assist [Flip] with negotiating and executing an agreement with such Main/Mid-Level/Second-Level Celebrity requiring the [Celebrity] to do [a list of tasks]."

36. The Parties also agreed on the criteria for determining the level of celebrity and examples of a celebrity at each level. Maddie Ziegler was specifically named as an example of a Main Celebrity in the Services Agreement.

37. The criteria for determining the level of each Celebrity as well as the deliverables from each Celebrity are subject to adjustment based on what is agreed directly with each Celebrity:

"Main Celebrity, Mid-Level Celebrity, Second-Level Celebrity, deliverables and the value attached to each are defined as such (unless different ones are agreed directly with the celebrities)."

38. Lastly, with respect to the vesting of the Fund Warrant, Paragraph 1(b) of the Warrant, which was attached as Exhibit 2.1A to the Services Agreement, provided: "In the Event the Agreement is terminated by Issuer for any reason, the shares subject to this Warrant shall immediately accelerate and be fully vested."

### C. CFM Fulfills Its Obligation to Introduce Flip to Celebrities and Further Assist Flip in their Negotiations with such Celebrities

39. On the same day the Parties executed the Services Agreement, Gil Eyal made a formal introduction between Flip's principals and Melissa Gisoni, Maddie Ziegler's mother and agent. Again, Maddie Ziegler was specifically named as an example of a Main Celebrity in the Services Agreement. Mr. Eyal's email not only introduced the two, but also promoted Flip in a way that would pique Ms. Gisoni's interest:

> **Gil Eyal** <gil@starfund.io>  Mon, Aug 3, 2020 at 11:51 PM
> To: Melissa Gisoni <gisonima@gmail.com>, Dor Sela <dor.sela.1@gmail.com>, Azhar Hashem <azhar@flipfit.com>, Nooruldeen Agha <noor@flipfit.com>
> Cc: Talani Goodson <talani@starfund.io>, Drederick Irving <dred@starfund.io>
>
> Hi Melissa,
>
> As discussed, I would love for you to meet the team at Flipfit. As mentioned, this is the fastest growing social network I have ever seen with over 250 million likes last month and an A+ investor list.
>
> Their product is geared around selling fashion and beauty products and is already an amazing distribution channel for brands. We think there can be amazing synergy. When we talked about partners Noor and Azhar said that Maddie and Kenzie embody everything they want their platform to stand for.
>
> I would love to schedule a call at your availability to discuss a potential collaboration. What is the best time for you this week? We would like to move fast.
>
> Thanks!
> Gil

40. Mr. Eyal's "introduction" email was successful as Flip met with Ms. Gisoni just three days later, on August 6, 2020.

41. Following that initial meeting, CFM "further assisted" the negotiations between Flip and Ziegler by sending a follow up email to Ms. Gisoni outlining the next steps towards signing a definitive agreement, including scheduling a call with both Maddie and Kenzie Ziegler (who is also a Main Celebrity), and having them install the Flip App before that call.

8

42. Mr. Eyal's follow up email and assistance with negotiations was successful. Ms. Gisoni expressed her own excitement in the partnership with Flip, writing an email stating: "Will send an introduction email shortly … So excited too!"

43. However, that same day, and without any warning, Flip notified CFM that despite its considerable efforts in arranging the meeting and generating excitement with Maddie Ziegler's management team, Flip unilaterally decided that "Maddie is the wrong person." Flip then directed CFM to search for the next Main Celebrity.

44. By introducing and then assisting in the negotiations between Flip and Maddie Ziegler, CFM fulfilled its obligations under Exhibit 1.1A of the Services Agreement. Flip, in turn, exercised its own discretion in bad faith by: (a) first naming Maddie Ziegler as a targeted Main Celebrity in the Services Agreement; (b) specifically directing CFM to make the introduction; (c) participating in an introductory call; and (d) unilaterally removing Ms. Ziegler from consideration.

45. Undeterred by Flip's sudden change of course, CFM continued to fulfill its obligations under the Services Agreement.

46. After August 7, 2020, CFM made numerous other introductions between Flip and Main Celebrities, including but not limited to Bethany Mota (15 million + followers), Zoella (20 million + followers), and Michelle Phan (10 million + followers). Based on these introductions, Flip met with and negotiated contracts with many of these and other Main, Mid-Level, and Second-Level Celebrities.

47. As to Bethany Mota, CFM introduced Flip to her management team, including her father. Flip then negotiated with Ms. Mota's team, which resulted in Flip approving CFM sending a contract proposal to her. While CFM took the initial lead in negotiating a contract, Flip

9

ultimately took over the negotiations, which included modifications to the requirements listed on Exhibit 1.1A of the Services Agreement.  An example of these negotiations is as follows:



48.     Flip eventually removed CFM from the discussions with Ms. Mota's team and thus CFM is unaware whether Flip ever signed an agreement with Ms. Mota.  Nonetheless, CFM fulfilled its obligation to both make the introduction and further assist in the negotiations of a contract.

49.     While CFM is unaware of the ultimate result of the negotiations with Ms. Mota, CFM has confirmed that Flip entered into contracts with at least two Main Celebrities to whom CFM was responsible for the introduction.  These two Main Celebrities are Kalani Hilliker and Mads Lewis, both of whom met the requirements for a Main Celebrity under the Services Agreement.

50.     With CFM's assistance, Flip signed a contract with Ms. Hilliker on or around September 30, 2020, and Flip did activate her as an influencer on the Flip App, as well as a promoter of Flip on other platforms such as Instagram.  Below is an email confirming the partnership with Ms. Hilliker:



51. Ms. Hilliker made multiple posts on Instagram and TikTok promoting Flip.





52. Also with CFM's assistance, Flip signed a contract with Mads Lewis, an influencer with more than 18 million followers. At Mr. Agha's direction, CFM spent many hours negotiating the deal between Flip and Mads Lewis, that Flip ultimately approved.

53. Following the confirmed deal with Mads Lewis, she began making multiple posts on Instagram promoting Flip, and she opened her own Flip Account.



54. Nine months after signing with Flip, Mads Lewis' agent contacted Mr. Eyal stating that the "FlipFit team has been unresponsive. They've tried changing the scope several times, and are now several months late on payment to Mads."

55. In addition to Main Celebrities, CFM also introduced Flip to and assisted with negotiations with Mid-Level and Second-Level Celebrities, many of whom also received approved offers from Flip. CFM is unaware of the progress of those offers as in October 2020, Flip unilaterally and unexpectedly ceased communicating with CFM.

56. After several attempts to connect with Flip did not receive a response, CFM finally was able to arrange a phone call with Agha at the end of October 2020 to discuss Flip's fulfillment

13

of its obligations under the Services Agreement.  On that phone call, Agha effectively terminated the Services Agreement and offered CFM a nominal fee to "go away."

57. In November 2020, as a last attempt to compel Flip to comply with its obligations under the Services Agreement—namely the issuance and vesting of the Fund Warrant and the option of CFM to invest in Flip's next funding round —CFM emailed Agha seeking a resolution. Flip never responded.

58. CFM later learned that after November 2020, Flip continued to receive the services of Main Celebrities and the other Celebrities introduced to Flip by CFM without providing any compensation to CFM in direct violation of the Services Agreement.

59. Under Section 2.5 of the Services Agreement, Flip "agrees and undertakes that once a Main Celebrity is introduced by [CFM] to [Flip], it will not, during the Term and for a period of six (6) months following termination (for any reason) or expiration of this Agreement, directly or indirectly, in any capacity whatsoever, engage or receive services from the Main Celebrity except in connection with [CFM]."

60. Flip cut off all connection with CFM while still engaging with Main Celebrities introduced by CFM well beyond termination.

**D. The Option for Future Investment**

61. As set forth above, in addition to the Fund Warrant, Flip also promised to provide CFM with the option to invest in future fundraising by Flip.

62. Section 2.1(d) of the Services Agreement provides:

> If prior to the consummation of an IPO, the Company offers, sells, or issues shares or any type of securities in a bona fide financing transaction with the principal purpose of raising capital or series of related such transactions, in consideration for a cash investment of at least $1,500,000, at a fixed pre-money valuation ..., then only with respect to the first Equity Financing raised by the Company, the Company shall offer [CFM] to participate in such Equity Financing whereby [CFM] may

14

choose at its sole discretion to invest up to the lower of 10% of the capital amount being raised or $5M in the Equity Financing[.]

63. After Flip ceased communicating with CFM, CFM heard nothing from Flip or about Flip until April 2024. In a press release on April 2, 2024, Flip, together with AppLovin Corporation, announced a $144M Series C funding round that included a $50M investment from AppLovin. In this funding round, Flip's pre-money valuation was set at $1.05B, with a post-money valuation set at $1.26B.

64. Prior to this Series C funding, Flip also raised approximately $30.62M in Series A funding in August 2021, and then another funding round of $60M in Series B funding in July 2022.

65. As required under the Services Agreement, Flip did not provide CFM with ten days prior written notice of any of these funding rounds, all of which occurred prior to the consummation of an IPO, and all of which constituted Equity Financing under the Services Agreement.

66. If given the opportunity to participate in the Series A funding, CFM would have been entitled invest approximately $3.062M in Flip amounting to an approximately 2.433% equity stake in Flip.

67. CFM may also have been entitled to pro-rata investment rights in all future Flip capital raise rounds as well as all other investor rights, the value of which to be proven at trial.

68. As a result of Flip's actions and inaction, CFM has suffered substantial damages in an amount to be proven at trial.

15

## COUNT I
### (Breach of Contract)

69. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

70. Plaintiff CFM and Flip are parties to a valid and enforceable agreement, the Services Agreement.

71. Under the Services Agreement, Flip promised to issue the Fund Warrant to CFM upon CFM's completion of various tasks, particularly using CFM's best efforts to introduce Celebrities to Flip and assist in the negotiation of contracts between such Celebrities and Flip.

72. Also under the Services Agreement, Flip promised to provide CFM with an Option for Future Investment in Flip up to the lesser of 10% of the capital amount being raised or $5M in Equity Financing.

73. The Services Agreement also restricted Flip from engaging or receiving services with any Main Celebrity except in connection with CFM.

74. CFM fulfilled its obligations under the Services Agreement.

75. Flip entered into contracts with multiple Celebrities introduced to them by CFM, and with which CFM assisted in the negotiations. Accordingly, Flip was obligated to issue the Fund Warrant to CFM and the Fund Warrant should be fully vested.

76. Flip terminated the Services Agreement. Accordingly: "the shares subject to this Warrant shall immediately accelerate and be fully vested."

77. Flip also engaged in multiple rounds of Equity Financing after the execution of the Services Agreement.

78. Flip breached the Services Agreement by: (a) not issuing the fully vested Fund Warrant to CFM; (b) not providing notice of the Series A Equity Financing that occurred in August

2021, thereby depriving CFM of the opportunity to invest in Flip; and (c) continuing to engage or receive services from Main Celebrities while not connecting with CFM.

79. As a result of Flip's multiple breaches of the Services Agreement, CFM has been damaged in an amount to be proven at trial.

## COUNT II
### (Breach of Covenant of Good Faith and Fair Dealing)

80. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

81. Under New York law, within every contract is an implied covenant of good faith and fair dealing, which prevents any party to a contract from performing acts with the intent to prevent performance of the contract or withhold benefits to the other party.

82. Moreover, when a contract contemplates the exercise of discretion by one party, the covenant of good faith and fair dealing precludes that party from acting arbitrarily or irrationally in the exercise of that discretion.

83. Here, the Services Agreement provided Flip with considerable discretion to negotiate terms of contracts, or reject contracts, with the Celebrities introduced to it by CFM.

84. Exhibit 1.1 of the Services Agreement described the manner in which the Fund Warrant would vest, and that manner included the negotiation of contracts with the Celebrities: contracts that had multiple, very specific requirements that Flip had discretion to waive or modify

85. Because Flip enjoyed sole discretion in negotiating the contracts with the Celebrities, it could, and actually did, negotiate terms of contracts that did not comply with the specific requirements set forth in the Services Agreement.

17

86. Flip also acted in bad faith in specifically asking CFM to target Maddie Ziegler as a Main Celebrity and then unilaterally rejecting Ms. Ziegler after CFM succeeded in making the introduction and garnering excitement from the Ziegler management team.

87. Flip exercised its discretion arbitrarily and in a manner aimed at preventing CFM from obtaining the benefits of the Services Agreement.

88. In addition to its bad faith exercise of discretion, Flip also intentionally terminated the Services Agreement verbally, and through non-communication in an effort to avoid the Termination provision contained therein. Specifically, Section 3 of the Services Agreement required that to terminate the Agreement, either party must provide fifteen days prior written notice to the other Party. Flip provided no such notice, but nonetheless terminated the Services Agreement during a phone call with CFM.

89. As a result of Flip's breaches of the covenant of good faith and fair dealing inherent in the Services Agreement, CFM has suffered damages in an amount to be proven at trial, with such damages to include the vesting of the Fund Warrant or an amount equal to the fair market value of the same. This amount exceeds the jurisdictional threshold of this Court.

## COUNT III
**(Unjust Enrichment – In the Alternative)**

90. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

91. CFM conferred a benefit upon Flip by introducing multiple Celebrities to Flip, which Flip then utilized to promote its product.

92. CFM expended considerable time and resources in conferring such benefit to Flip. CFM also utilized its reputational capital, which at times was harmed when Flip rejected contracts with Celebrities and/or signed contracts but did not pay the Celebrities.

93. Based upon the circumstances set forth above, it would be against equity and good conscience to permit Flip to retain the benefits conferred upon by CFM without compensating CFM for the same.

94. As a result of Flip's unjust enrichment, CFM has been damaged by Flip in an amount that exceeds the jurisdictional threshold of this Court and in an amount to be determined at trial.

WHEREFORE, Plaintiff Celebrity Fund Management LLC demands that judgment be entered against Defendant Humans, Inc. on Counts I and II, or Count III in the event the Services Agreement is deemed not a valid and enforceable contract, and that Plaintiff be awarded its reasonable costs and disbursements to the extent available by law, and for such other and further relief as this Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all the triable issues raised in this Complaint.

Dated: July 12, 2024
New York, New York

GREENSPOON MARDER LLP

By: */s/ Marc D. Walkow*
Marc D. Walkow, Esq.
1345 Avenue of the Americas, Suite 2200
New York, New York 10105
Phone: 212-524-4967
marc.walkow@gmlaw.com

Alan D. Schindler, Esq. (admission pending)
Anna Goldman, Esq. (admission pending)
1144 15th Street, Suite 2700
Denver, Colorado 80202
Phone: 720-702-0918
alan.schindler@gmlaw.com
anna.goldman@gmlaw.com

*Attorneys for Plaintiff Celebrity Fund Management LLC*