UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CELEBRITY FUND MANAGEMENT, LLC,

Plaintiff,

-against-

HUMANS, INC., doing business as Flipfit,

Defendant.

24-CV-5282 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Celebrity Fund Management, LLC ("CFM") brings this action against Defendant Humans, Incorporated, doing business as Flipfit ("Flip"). Flip, a startup company, sought the help of CFM, a company that specializes in introducing startups to celebrities and influencers, to promote its product. According to Plaintiff, CFM fulfilled its end of the bargain, introducing the company to various celebrities and helping negotiate agreements with the same. In exchange for these services, Flip was to provide equity warrants and a contractual right to invest in Flip's next round of financing. The parties entered a contract memorializing this agreement, but it was entered into by Flip and CFM on behalf of a non-existent entity that CFM planned to form. The entity was never formed, but CFM alleges that it performed substantially under the parties' contract and did not receive the compensation owed to it under the contract. Plaintiff asserts claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Pending before the Court is Defendant's motion to dismiss Plaintiff's Amended Complaint. For the reasons stated herein, Defendant's motion is DENIED.

## BACKGROUND

The Court sets forth the factual background relevant to this motion and outlines the relevant procedural history of this case.

## I.    Factual Background

Plaintiff CFM is a limited liability company, and it has two members, Gil Eyal ("Eyal") and Ori Eyal, who invest in startup companies and specialize in introducing social media influencers and celebrities to startup companies. ¶¶ 2, 10–11.[1] Eyal has been recognized as a leader in the celebrity-influencer marketing space. ¶ 16. Eyal and CFM have built and maintained an extensive network of celebrities and influencers, and their agents. *Id.* Defendant Flip was founded by Nooruldeen Agha ("Agha") and Jonathan Ellman. ¶ 17. Flip, an early-stage start up company, created the Flip App, which is a social media network that allows users to shop for various products in-app. *Id.* Flip's founders reached out to CFM for help launching the Flip App. *Id.* After the parties were introduced, Agha emailed Eyal asserting that Flip was building a complex business and wanted to work with CFM to do so. ¶ 18. Shortly thereafter, the parties negotiated a services agreement ("Services Agreement" or "Agreement"). ¶ 19. CFM sent a proposed initial draft for Flip's review on July 2, 2020. *Id.* That same day, the parties agreed to general terms. *Id.* Flip did not send CFM back comments on the draft Services Agreement until July 29, 2020. ¶ 21.

However, between receiving the contract and sending back comments, the parties moved forward with a working relationship. ¶ 20. Flip sent an email to CFM asking for an update on their progress, and on July 16, 2020, CFM informed Flip that its TikTok outreach had begun and was receiving a positive response. *Id.* On July 22, 2020, Agha requested a call with Eyal to iron out the parties' work process, key performance indicators, and tasks. ¶ 22. The email also contained a note that Agha had expected CFM to have already introduced Flip to three social

---

[1] All paragraph references herein refer to Plaintiff's Amended Complaint ("FAC") at ECF No. 17 unless otherwise noted.

media influencers, including Maddie Ziegler ("Ziegler"), despite not having signed any Services Agreement. *Id.* In response, Eyal reminded Agha that he would not set up meetings with Flip without the signed Services Agreement. ¶ 23. Nonetheless, on July 24, 2020, CFM informed Agha that it had contacted Ziegler's agents, and they had expressed an eagerness to meet. ¶ 24.

When Flip sent CFM a revised draft agreement on July 29, 2020, it contained a jointly drafted exhibit ("Exhibit"), which outlined the scope of work and value of agreed-upon deliverables. ¶ 25. The deliverables were divided into three categories (Main Celebrity, Mid-Level Celebrity, Second-Level Celebrity), and Ziegler was listed as a "Main Celebrity." ¶¶ 25, 38. Subsections A, B, and C of Exhibit 1.1 each pertain to the different tiered celebrities but uniformly require the Fund to introduce Flip to celebrities and further assist the Company with negotiating and executing an agreement with that celebrity. ¶ 37; ECF No. 6-1 ("Servs. Agreement"), Exhibit 1.1 §§ 7.A., 7.B., 7.C. The subsections outline what tasks the celebrity should agree to complete, with the caveat that the deliverables could change if different ones were agreed to directly with the celebrities. Servs. Agreement, Exhibit 1.1 § 7.

The Exhibit states that a "specific equity amount is tied to each deliverable" and "[a]ll compensation to the Fund shall be as set forth in Section 2 of the agreement." Servs. Agreement, Exhibit 1.1 §§ 3, 4. On July 30, 2020, in response to the draft Exhibit, Eyal sought confirmation of when Flip would owe CFM equity under the Agreement. ¶ 26. Agha responded to Eyal's email by confirming that any equity due to Plaintiff would vest upon completion of each stage (introduction to Main Celebrities, Mid-Level Celebrities, and Second-Level Celebrities) in the drafted Exhibit. *Id.* In the same email, Agha also promised to revise the draft agreement to reflect this mutual intention. *Id.* Exhibit 1.1 of the final Services Agreement provides that a "specific

equity amount is tied to each deliverable and is earned separately, assuming $1 million is equal to 1.6% equity." ¶ 35; Servs. Agreement, Exhibit 1.1 § 3.

The final Services Agreement was signed by the parties on August 3, 2020, with an effective date of August 2, 2020. ¶ 27. The Services Agreement states that it is entered into "by and between Celebrity Fund Management LLC, a Delaware limited liability company with a principal place of business at 333 River St. Apt. 1143, Hoboken, NJ, 07030 *on behalf of* a venture capital fund in formation (the "Fund"), and Humans, Inc. (d/b/a FlipFit), a Delaware corporation with a principal place of business at 186 Collins Street, San Francisco, CA 94118 ("Company")." Servs. Agreement at 2 (emphasis added). The Agreement thereafter defines the parties as the "Fund" and the "Company." *Id.*

However, Celebrity Fund Management LLC is referenced several places in the Agreement. The first is Section 2.3, which dictates that "in the event that the Fund's initial closing does not take place by [_____], then the then holder of the Warrant shall transfer the Warrant to Celebrity Fund Management LLC (the 'Management Company') . . . ." *Id.* § 2.3. The second is the signature page which states that "each Party hereto has duly executed this Agreement as of the Effective Date" and is signed by Gil Eyal, Partner of Celebrity Fund Management LLC. *Id.* at 7. Third, the sample Form of Warrant appended to the Agreement names CFM, not the Fund, as the entity entitled to purchase shares from Flip. ECF No. 6-1, Exhibit 2.1A. And fourth, the Agreement implicitly references CFM in its definition of "Fund Affiliates," which includes the Fund's "general partner, management company and persons and entities controlling controlled by or under common control with any of them." *Id.* § 1.1.

CFM intended to form a venture capital fund that would, upon closing, step into CFM's shoes as the party in interest to the Services Agreement. ¶ 28; Servs. Agreement at 2. When the

Services Agreement was executed, CFM had not formed the contemplated fund and thus signed the Services Agreement as a "Party hereto." ¶ 28; Servs. Agreement at 7. Ultimately, CFM never formed the contemplated fund. ¶ 29.

The Services Agreement dictates that Fund Affiliates (which Plaintiff alleges includes CFM) agreed to use their best efforts to provide the services as detailed in the agreement. ¶ 30. CFM used its best efforts to do so since June 19, 2020. ¶ 31. In exchange for these best efforts, Flip agreed to provide compensation in two forms: 1) by issuing a Fund Warrant, and 2) by the option to make future investments in Flip. ¶¶ 32, 76–77.

The issuance of the Fund Warrant and the vesting of the Fund Warrant are detailed in Section 2.1 of the Services Agreement. ¶¶ 33–34. Specifically, the Services Agreement states that Flip would issue warrants to the Fund ("Fund Warrants") to "purchase common stock calculated on a fully diluted basis." Servs. Agreement § 2.1. The Agreement dictates that prior to the issuance of the Fund Warrants, Flip shall receive a third-party company valuation, which the Fund could elect to use. *Id.* § 2.1(c). In the event Flip failed to issue a third-party valuation, the Fund was to notify Flip, giving Flip fifteen days to cure the failure. *Id.* If Flip failed to cure within fifteen days, each of the shares of the Fund Warrants would immediately vest. *Id.* The Agreement also notes that Fund Warrants "shall vest upon the signing of a definitive agreement" between Flip and a "Main Celebrity." *Id.* § 2.1(b). Exhibit 2.1A to the Services Agreement further provides that in the event that the Agreement was terminated by Flip for any reason, the shares subject to the Fund Warrant were to be immediately accelerated and fully vested. ¶¶ 40, 81.

The option to make future investments is also detailed in Section 2.1 of the Services Agreement. Specifically, the Services Agreement states that:

> If prior to the consummation of an IPO, the Company offers, sells, or issues shares or any other type of securities in a bona fide financing transaction with the principal purpose of raising capital or series of related such transactions, in consideration for a cash investment of at least US $1,500,000, at a fixed pre-money valuation ("Equity Financing"), then only with respect to the first Equity Financing raised by the Company, the Company shall offer the Fund to participate in such Equity Financing . . . .

Servs. Agreement § 2.1(d).

On August 3, 2020, Eyal introduced Flip's principals to Ziegler's mother and agent, Melissa Gisoni, via email. ¶ 41. Three days later, Flip and Gisoni had their first meeting. ¶ 42. Thereafter, CFM emailed Gisoni outlining the next steps towards signing an agreement and scheduling a call with Ziegler and another "Main Celebrity" and installing the Flip App. ¶ 43. Gisoni was excited about the partnership opportunity. ¶ 44. However, without warning, Flip notified CFM that it decided Ziegler was the wrong person for the opportunity and directed CFM to search for a different "Main Celebrity." ¶¶ 45, 91. Pursuant to the Services Agreement, CFM did not have any authority to compel Flip to execute an agreement with any celebrity, so after Ziegler was determined to be the wrong fit, CFM continued to fulfill its obligations under the Services Agreement. ¶¶ 47, 48.

After August 7, 2020, CFM introduced Flip to several influencers who met the requirements of "Main Celebrity" under the Services Agreement. ¶ 49. As a result of these introductions, Flip met with and negotiated several contracts with various tiered celebrities, including Bethany Mota, Zoella, and Michelle Phan. *Id.* CFM introduced Flip to Mota's management team, which included her father. ¶ 50. CFM also assisted with negotiating a contract, initially taking the lead before Flip took over negotiations. *Id.* Eventually, Flip removed CFM from their discussions, and CFM does not know if any agreement was ever signed between Flip and Mota. ¶ 51. CFM also assisted in negotiations with Mid-Level and Second-Level

celebrities who received offers from Flip, though CFM was unaware of the progress of those offers as of October 2020. ¶ 58

CFM also introduced Flip to Kalani Hilliker, who qualified as a "Main Celebrity." ¶ 52. With the help of CFM, Hilliker and Flip signed a contract around September 30, 2020. ¶ 53. Flip activated Hilliker as an influencer on the Flip App and as a promoter of Flip on other platforms such as Instagram. *Id.* Hilliker subsequently made several posts on Instagram and TikTok promoting Flip. ¶ 54.

CFM also introduced Flip to Mads Lewis, who qualified as a "Main Celebrity." ¶ 55. At Agha's direction, CFM spent significant time negotiating a deal between Flip and Lewis. *Id.* After the deal was approved, Lewis began making several posts on Instagram promoting Flip, in addition to opening a Flip Account. ¶ 56. Nine months after Lewis and Flip's deal, Lewis' agent contacted Eyal because the Flip team had been unresponsive and was several months late on payments to Lewis. ¶ 57. CFM attempted to contact Flip and was able to arrange a phone call with Agha at the end of October 2020. ¶ 59. On that call, Plaintiff alleges that Agha effectively terminated the Services Agreement and offered CFM a nominal fee to "go away." *Id.* There was no prior written notice. ¶ 93. CFM emailed Agha in November 2020 regarding the issuance and vesting of the Fund Warrant and the option of CFM to invest in Flip's next funder round. ¶ 60. Flip never responded. *Id.*

CFM later learned that, despite Agha effectively terminating the Services Agreement, Flip continued to receive services from celebrities CFM introduced Flip to. ¶¶ 63, 78. Plaintiff alleges this conduct amounts to a breach of Section 2.5 of the Services Agreement, ¶ 64, which states that:

> The Company agrees and undertakes that once a Main Celebrity is introduced by the Fund to the Company, it will not, during the Term and for a period of six (6)

> months following termination (for any reason) or expiration of this Agreement,
> directly or indirectly, in any capacity whatsoever, engage or receive services from
> the Main Celebrity except in connection with the Fund.

Servs. Agreement § 2.5. Section 2.5 of the Agreement makes clear that the non-compete

clause applied from the effective date of the Agreement (August 2, 2020) until six months

after its expiration or termination. *See* Servs. Agreement § 2.5 (Flip agreed to not

compete "during the Term and for a period of six (6) months following termination"); *id.*

§ 3 (defining the Term as the effective date through termination of the Agreement).

CFM did not hear anything from or about Flip again, until April 2024. ¶ 67. On

April 2, 2024, Flip and AppLovin Corporation announced a $144 million Series C

funding round in a press release. *Id.* In this funding round, Flip's pre-money valuation

was set at $1.05 billion, with a post-money valuation of $1.26 billion. *Id.* Prior to this, in

August 2021, Flip raised approximately $30.62 million in Series A funding, and $60

million in Series B funding in July 2022. ¶¶ 68, 82. Flip did not, however, provide CFM

or any CFM fund with prior written notice of these funding rounds, which all occurred

prior to the consummation of the IPO and constituted equity financing under the Services

Agreement. ¶ 69. If CFM was given the opportunity to participate in Series A funding, it

would have been entitled to invest about $3.062 million in Flip, resulting in an

approximately 2.433% equity stake. ¶ 70. CFM has, at all times, had the ability to make

this investment, including during the August 2021 Series A funding. ¶ 71.

## II. Procedural History

Plaintiff initiated this action on July 12, 2024, and Plaintiff's complaint was filed on July

15, 2024. ECF Nos. 1, 6. The following month, on August 19, 2024, Defendant moved to dismiss

Plaintiff's complaint. ECF Nos. 13, 14. In response, on September 11, 2024, Plaintiff filed an

amended complaint as a matter of right. ECF No. 17 ("FAC"). On October 9, 2024, Defendant

filed the instant motion to dismiss and a motion to stay discovery. ECF Nos. 22, 23 ("Mem."),

24. Plaintiff filed opposition briefs to both motions on October 30, 2024. ECF Nos. 28 ("Opp."),

29. Defendant filed reply briefs for both motions on November 6, 2024. ECF Nos. 30 ("Reply"),

31. On November 13, 2024, the Court denied the motion to stay discovery, finding that

Defendant had not demonstrated good cause for the requested stay. ECF No. 33.

## LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the

complaint liberally, accepting all factual allegations in the complaint as true, and drawing all

reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)

(internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff

alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id.* at 678. If a complaint does not state a

plausible claim for relief, it must be dismissed. *Id.* at 679.

## DISCUSSION

First, the Court analyzes Plaintiff's contract claim, finding that Plaintiff sufficiently

pleads the existence of a contract enforceable by CFM. The Court then addresses each of

Defendant's arguments concerning whether Plaintiff has alleged facts sufficient to state a claim for breach of contract. The Court finds that Plaintiff has plausibly alleged that Defendant (1) breached its obligation to issue a vested Fund Warrant to CFM, (2) breached its obligation to provide CFM an opportunity to invest in Flip, and (3) breached the Service Agreement's non-compete clause. Second, the Court analyzes Plaintiff's claim for breach of the covenant of good faith and fair dealing and finds that because the parties disagree as to the Agreement's express terms, the claim may proceed in the alternative. Lastly, the Court analyzes Plaintiff's unjust enrichment claim, finding that because Defendant contests the validity of the contract between CFM and Flip, the unjust enrichment claim may proceed in the alternative. For these reasons and as explained in further detail *infra*, Defendant's motion to dismiss is DENIED.

## I.    Plaintiff Sufficiently Asserts a Claim for Breach of Contract

To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

### A.  Plaintiff Pleads the Existence of a Contract Between CFM and Flip

The threshold question here is whether a contract was formed between the parties. Defendant asserts that CFM is not and was never a "party" to the Services Agreement, because CFM signed the agreement on behalf of the Fund. Mem. at 6–10.  Because the Services Agreement is incorporated by reference into the Complaint, the Court may consider it. *See Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 407 (S.D.N.Y. 2011) (explaining that a court may consider the contents of a document "[w]here a plaintiff has relied on the terms and

effect of a document in drafting the complaint, and that document is thus integral to the complaint . . . .").

Although the Services Agreement was entered into by Flip and CFM on behalf of a venture capital fund in formation (the "Fund"), the fact that the Fund was never established does not doom CFM's breach of contract claim as Defendant suggests. Instead, this case is analogous to *Sutton v. Houllou*, 141 N.Y.S.3d 501 (2nd Dep't 2021). There, two brothers, plaintiffs in the matter, executed an agreement on behalf of their non-existent company, Damax, with a third-party company called AMD. *Id.* at 502. Although the brothers intended to form Damax, they never took the steps to form the entity. *Id.* at 503. Nonetheless, they alleged that they continued to perform work for AMD and were not issued distributions contemplated by the agreement between Damax and AMD. *Id.* When defendants moved to dismiss the complaint, the court denied the motion, and the Second Department affirmed the decision, finding that "plaintiffs ha[d] standing to enforce the agreement in light of the fundamental contract principle of the mutuality of obligation." *Id.*

The same principle applies here. As in *Sutton*, the Agreement "remains valid and enforceable as between [Flip] and [CFM] who executed the contract on behalf of the nonexistent principal[.]" *Sutton*, 141 N.Y.S.3d at 503 (quoting *Metro Kitchenworks Sales, LLC v. Cont. Cabinets, LLC*, 820 N.Y.S.2d 79 (2nd Dep't 2006); *accord Ruso v. Morrison*, 695 F. Supp. 2d 33, 51 (S.D.N.Y. 2010) ("When an individual executes a contract as an agent on behalf of a non-existent principal, the contract remains valid but is enforceable against the individual who claims to be an agent."); *see also* Restatement (Third) Of Agency § 6.04 (2006) ("[I]f a [company] who purports to act as an agent knows or has reason to know that the [company] purportedly

represented does not exist or lacks capacity to be a party to even a voidable contract, the [company] purporting to act as agent will become a party to the contract.").

Defendant's cited case law does not alter this conclusion. Defendant cites cases that stand for the proposition that a person making or purporting to make a contract with another as an agent for a disclosed principal does not become a party to the contract, absent an agreement to the contrary. Mem. at 7–8. However, in each of the cases Defendant cites, the principal is an entity that was formed and existed. *See, e.g.*, *Colonial Sec., Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 461 F. Supp. 1159, 1165–66 (S.D.N.Y. 1978) (finding that an entity, which acted solely as a delivery agent, did not become a party to the contract between an existing bank and companies with accounts at the bank); *Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co.*, 642 F. Supp. 3d 445, 480 (S.D.N.Y. 2022) (finding that an agent could not sue on behalf of its principal, an incorporated company). Here, the Fund was never formed and has no ability to enforce the terms of the Agreement. Instead, that ability lies with CFM, who has acted on behalf of the Fund it never formed. As such, Plaintiff sufficiently alleges the existence of a contract between CFM and Flip.

And even if CFM could not enforce the contract under the theory of mutuality of obligation, the ambiguity of the contract would prevent dismissal. *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639–40 (S.D.N.Y. 2020) ("Any contractual ambiguities must be resolved in the plaintiff's favor."). Under New York law, "ambiguity exists where the contract terms 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'"

*Pro. Fighters League, LLC v. Takeover Indus., Inc.*, 770 F. Supp. 3d 718, 724 (S.D.N.Y. 2025) (quoting *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).

Here, the Agreement inconsistently identified both CFM and the Fund as parties to the Agreement or parties entitled to compensation under the Agreement. The preamble to the contract states that CFM was entering the contract "on behalf of a venture capital fund in formation," but the signature page makes no such distinction. *Compare* Servs. Agreement at 2 *with* Servs. Agreement at 7. Additionally, the Form of Warrant appended to the Agreement lists CFM as entitles to Warrant Shares in Flip. *See* Servs. Agreement, Exhibit 2.1A. It is therefore reasonable to infer from the ambiguity that the parties viewed CFM as a party to the agreement or as entitled to compensation under it. Therefore, this ambiguity likewise precludes dismissal. *See Pro. Fighters League*, 770 F. Supp at 724 (quoting *Maverick Tube*, 595 F.3d at 465) ("The matter of whether the contract is ambiguous is a question of law for the court."); *MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 454 (S.D.N.Y. 2016) ("Where a contract is ambiguous, however, a fact issue exists precluding dismissal under Fed. R. Civ. P. 12(b) (6).") (internal citation omitted).

### B.  Plaintiff Sufficiently Alleges Various Breaches of the Services Agreement

Defendant next contends that Plaintiff has not alleged that Flip breached any provision of the contract. In particular, Defendant asserts that Plaintiff fails to properly allege that: (1) any obligation to issue a fully vested warrant arose; (2) Defendant breached its obligation to provide Plaintiff an opportunity to invest, or (3) the non-compete terms of Section 2.5 of the Agreement were triggered. *See* Mem. at 10–17. The Court addresses each argument in turn.

1. **Plaintiff Has Sufficiently Alleged That Defendant Breached Its Obligation to Issue a Vested Fund Warrant**

The Services Agreement states that upon the completion of the services described in Exhibit 1.1, subsections A, B, and C, Flip would issue warrants to the Fund ("Fund Warrants") to "purchase common stock calculated on a fully diluted basis." Servs. Agreement § 2.1. It further states that the warrant "shall vest upon the signing of a definitive agreement" between Flip and a "Main Celebrity." *Id.* § 2.1(b).

Defendant argues that Plaintiff has not alleged facts that it had any obligation to issue a fully vested warrant because (1) the Fund Warrants were due to the Fund and not CFM; (2) the requisite steps were not taken prior to the issuance of the warrants, and (3) there are no facts alleged for vesting to have occurred. For the reasons explained *supra* at Section I.A., the Court finds Defendant's first argument—that the Fund Warrants were due to the Fund and not CFM— unpersuasive at this stage.

The Court also finds Defendant's second argument unpersuasive. Defendant claims that certain pre-conditions were required but not met prior to the issuance of any Fund Warrants. Mem. at 11–15. Section 2.1(c) of the Agreement dictates that prior to the issuance of Fund Warrants, Flip shall procure a company valuation. Servs. Agreement § 2.1(c). It further states that that if Flip fails to meet its obligation to timely receive the company's valuation and deliver it to the Fund, the Fund shall notify the company, thereby triggering a cure period. *Id.* If Flip failed to cure, the Agreement dictates that "each of the shares subject to the Warrants shall immediately become fully vested." *Id.* This provision—that Flip's failure to cure renders the warrants vested—contradicts the paragraph's earlier insinuation that these actions would take place "[p]rior to the issuance of the Warrants." *Id.* The Agreement also states, without qualification, that Flip "shall issue" Fund Warrants as "sole and sufficient consideration for the services

provided by the Fund" and those Fund Warrants would "vest upon the signing of a definitive agreement between the Company and a Main Celebrity." Servs. Agreement § 2.1(b). These contract provisions are in conflict, with one suggesting that there are pre-conditions to issuing Fund Warrants, and another indicating that as consideration for entering the contract, Flip would immediately issue Fund Warrants that would automatically vest upon certain conditions being met. The contract is therefore ambiguous as to this issue. "[G]iven these problematic terms and the context at hand, the Court finds the [conditions for the issuance of Fund Warrants] ambiguous on this point, and therefore cannot grant [Defendant's] motion to dismiss on this basis." *Bus. Exposure Reduction Grp. Assocs., LLC v. Pershing Square Cap. Mgmt., L.P.*, 549 F. Supp. 3d 318, 329 (S.D.N.Y. 2021).

With respect to Defendant's third argument, Plaintiff has pled sufficient facts necessary for vesting to have occurred under the Services Agreement. Plaintiff alleges that it introduced Flip to Kalani Hilliker and Mads Lewis, who qualified as Main Celebrities. ¶¶ 52–56. Thereafter, Plaintiff helped to negotiate a deal with the celebrities, which Flip ultimately approved. *Id*. The Services Agreement plainly states that the necessary terms as detailed in Exhibit 1.1 are flexible and "different ones [can be] agreed [to] directly with the celebrities." Servs. Agreement, Exhibit 1.1 § 7. Thus, Plaintiff need not, as Defendant suggests, allege that Lewis or Hilliker fulfilled the exact terms in Exhibit 1.1.

Taking Plaintiff's allegations as true, Plaintiff sufficiently alleges all elements of breach of contract. Plaintiff has pled facts sufficient to demonstrate that it performed under Section 2.1 of the Agreement. It introduced Flip to at least two "Main Celebrities" and helped to negotiate and execute an agreement with those celebrities. Plaintiff has also alleged facts sufficient to demonstrate that Defendant failed to perform. In accordance with Section 2.1 of the Agreement,

a vested warrant was to be issued upon CFM's performance as outlined above. Servs. Agreement §§ 2.1; 2.1(b). Plaintiff alleges that Defendant did not issue a vested Fund Warrant and thus has alleged Defendant's failure to perform. ¶ 83. Lastly, Plaintiff alleges that it suffered damages, including the lost value of the Fund Warrant. ¶ 84.

For the foregoing reasons, the Court finds that Plaintiff has asserted each element of breach of contract with respect to Defendant's obligation to issue a vested Fund Warrant.

### 2. Plaintiff Has Sufficiently Alleged That Defendant Breached Its Obligation to Provide Plaintiff an Opportunity to Invest

Plaintiff also states a claim for breach of contract based on Defendant's failure to provide CFM an opportunity to invest. As explained *supra* § I.B.1, Plaintiff has already pled the first two required elements for breach of contract. Additionally, as explained *supra* § I.A, the contract remains valid and enforceable between Flip and CFM, who executed the contract on behalf of the nonexistent principal. *See Sutton*, 141 N.Y.S.3d at 501. Plaintiff also alleges the remaining two elements for a breach of contract claim—failure of Defendant to perform, and damages.

Plaintiff alleges that Flip raised $30.62 million in Series A funding in August 2021, which was prior to the consummation of an IPO and constituted Equity Financing. ¶¶ 68–69. Plaintiff further alleges that Flip did not provide Plaintiff with prior notice of any funding round as required by Section 2.1(d) of the Services Agreement. ¶ 69. As such, Plaintiff sufficiently alleges that Defendant failed to perform.

Plaintiff also sufficiently alleges that it has suffered damages. Specifically, Plaintiff asserts that it suffered damages through a "lost opportunity to invest in Flip to obtain additional equity" in Flip, which was an option expressly provided for by the Agreement. ¶ 84; Servs. Agreement § 2.1(d). Plaintiff further asserts that at all times, CFM had the ability to make a

$3.062 million investment in Flip, amounting to an approximately 2.433% equity stake. ¶¶ 70–71.

Accordingly, Plaintiff has asserted each element of breach of contract with respect to Defendant's obligation to provide Plaintiff with an opportunity to invest in Flip. *See Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 808–09 (2014) (permitting plaintiff to plead lost profits damages upon a finding that the "distinction at the heart of these cases is [that] the lost profits flowed directly from the contract itself") (collecting cases); *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993) (explaining that lost profits are recoverable damages if "they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty"); *cf. Yalkowsky v. Century Apartments Assocs.*, 626 N.Y.S.2d 181, 183 (1st Dep't 1995) (dismissing plaintiff's breach of contract claim based on plaintiff's failure to allege that he was "ready, willing and able" to tender purchase price pursuant to a purchase agreement).

### 3. Plaintiff Sufficiently Alleges Breach of Contract Concerning the Agreement's Non-Compete Clause

Defendant asserts that Plaintiff failed to establish a plausible breach of contract claim based on the Agreement's non-compete clause. Mem. at 17. Although Plaintiff alleges that in October 2020, Agha "effectively terminated the Services Agreement," ¶ 59, Defendant asserts that the non-compete clause does not apply because Plaintiff has not pled that termination as contemplated by the Agreement ever occurred. Mem. at 17. However, Defendant's argument to the contrary is a factual dispute that is inappropriate for resolution on a motion to dismiss. *See Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020).

Furthermore, even if the Agreement was not formally terminated, Section 2.5 makes clear that the non-compete clause applied from the effective date of the Agreement (August 2, 2020) until six months after its expiration or termination. *See* Servs. Agreement § 2.5 (Flip agreed to not compete "during the Term and for a period of six (6) months following termination"); *id.* § 3 (defining the Term as the Effective Date through termination of the Agreement). Therefore, any engagement with celebrities introduced to Flip by CFM while the Agreement was still in effect, but occurring outside of CFM's purview, would plausibly violate the non-compete clause. Plaintiff alleges that it introduced Kalani Hilliker and Mads Lewis, "Main Celebrities," to the company, and that "Flip cut off all connection with CFM while still engaging with Main Celebrities." ¶¶ 52, 63. At this stage, this is sufficient to plead that Defendant failed to adhere to its obligations under the contract.

Plaintiff also sufficiently alleges damages, asserting that it suffered "reputational harm from Flip's continued engagement with Celebrities introduced to Flip by CFM." ¶ 84. "These allegations are sufficient to survive a motion to dismiss." *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) (finding plaintiff's allegation that the purported breaches damaged plaintiff's "goodwill, standing, and reputation" sufficient to plead damages); *Samsung Display Co. v. Acacia Rsch. Corp.*, No. 14-CV-1353 (JPO), 2014 WL 6791603, at *3 (S.D.N.Y. Dec. 3, 2014) ("[Plaintiff] has identified specific injury in the form of damage to its goodwill and reputation-and that is satisfactory on a motion to dismiss."). Accordingly, Plaintiff has alleged facts sufficient to plead breach of contract regarding the non-compete agreement.

18

## II.     Plaintiff Sufficiently Pleads a Claim for Breach of the Covenant of Good Faith and Fair Dealing in the Alternative

Plaintiff's second claim is that Defendants breached the covenant of good faith and fair dealing by engaging in a "bad faith" exercise of discretion by negotiating celebrity contracts that did not comply with the requirements of the Services Agreement and by rejecting Maddie Ziegler. Opp. at 21.

"The implied covenant of good faith and fair dealing is incorporated into every contract." *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015). Under New York law, parties to a contract "are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (internal citation omitted). There is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Id.* at 81. Therefore, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

Under New York law, a party breaches the implied covenant of good faith and fair dealing when it "do[es] anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)); *see also Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 428 (S.D.N.Y. 2020) ("The implied covenant is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the

benefits under their agreement.") (internal citation and quotation marks omitted). Plaintiff alleges that Flip arbitrarily exercised its discretion to negotiate the terms of contracts with celebrities in a manner which prevented CFM from obtaining the benefits of the Services Agreement, and by rejecting Maddie Ziegler. Opp. at 21. The implied covenant prohibits arbitrary or irrational exercises of discretion. *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 810 (2d Cir. 2014). Accordingly, Plaintiff has plausibly stated a claim for breach of the covenant of good faith and fair dealing. *See Stanley*, 466 F. Supp. 3d at 429 (finding plaintiff stated a claim for breach of the covenant where plaintiff alleged that defendant exercised discretion in a manner inconsistent with plaintiff's reasonable expectations).

Generally, "[a] claim for violation of the covenant survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). Here, Plaintiffs concede that "CFM's breach of contract claim and covenant of good faith and fair dealing claim are premised largely . . . on the same set of facts—i.e. Flip's failure to recognize CFM's completion of the Services described in Exhibit 1.1 to the Services Agreement." Opp. at 21. Indeed, Plaintiff alleges that as a result of Defendant's bad faith exercise of discretion, it has suffered damages including "vesting of the Fund Warrant or an amount equal to the fair market value of the same." ¶ 94.

Nonetheless, Plaintiff contends that because the parties disagree as to the Agreement's express terms, there is no reason to bar Plaintiff from asserting a claim for breach of the implied covenant of good faith and fair dealing in the alternative. Opp. at 20. In support of its contention that it should be allowed to assert a claim for good faith and fair dealing in the alternative,

Plaintiff cites to *Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018). There, the Court held that where "there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." *Id.* at 206.

Here, the parties disagree about whether the Services Agreement's express terms required celebrity contracts to contain an immutable set of deliverables. *Compare* Mem. at 4, 12–14 (arguing that Plaintiff did not meet key, unchangeable deliverables as set forth in Exhibit 1.1 to the Agreement and thus is not entitled to vested Fund Warrants), *with* Opp. at 16–18 (arguing that the key deliverables set forth in Exhibit 1.1 were modifiable, and thus validly met, entitling Plaintiff to vested Fund Warrants). "[D]espite holding for [the] purposes of resolving [Defendant's] motion that the Amended Complaint has alleged a plausible claim for breach, the Court expresses no view as to whether [Plaintiff] will ultimately succeed in proving a breach of the [Services] Agreement's express terms, including with respect as to whether its interpretation of the relevant provisions of the [Services] Agreement will ultimately prove to be correct." *Alta Partners, LLC v. BitFuFu Inc.*, No. 24-CV-6849 (JPC) (GWG), 2025 WL 2145557, at *10 (S.D.N.Y. July 29, 2025). Accordingly, and because "the parties' disagreement relates to what they were entitled to under the contract," Defendant's motion to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is denied, and Plaintiff may assert this claim in the alternative. *Perrigo Pharma Int'l Designated Activity Co. v. Mead Johnson & Co. LLC*, No. 23-CV-00008 (ER), 2024 WL 1375947, at *18 (S.D.N.Y. Apr. 1, 2024).

### III.    Plaintiff Sufficiently Pleads a Claim for Unjust Enrichment in the Alternative

Unjust enrichment is "a New York common law quasi-contract cause of action requiring the plaintiff to establish: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3)

that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (internal citation and quotation marks omitted).

Plaintiff sufficiently alleges each element. First, Plaintiff alleges that Flip benefitted from various celebrity introductions, which Flip used to promote its product. ¶ 96. Second, Plaintiff alleges that it spent "considerable time and resources" and "utilized its reputational capital" in conferring this benefit to Flip." ¶ 97. Third, Plaintiff alleges that it would be against equity and good conscience to permit Flip to retain the benefits Plaintiff conferred upon it without justly compensating CFM. ¶ 98. Reading the Amended Complaint in the manner most favorable to CFM, the parties' "dealings here were substantial, and plausibly raise an inference of inequitable conduct of which [Flip] was the beneficiary." *Obeid v. Mack*, No. 14-CV-6498 (LTS), 2016 WL 1069678, at *5 (S.D.N.Y. Mar. 17, 2016). "These allegations, taken together, suffice to state an unjust enrichment claim." *Id.*

Even if a Plaintiff sufficiently states the elements of the claim, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim[.]" *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Rather, "[i]t is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* "An unjust enrichment claim is duplicative if it relies on the same conduct that forms the basis of the plaintiff's other claims." *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 44 (S.D.N.Y. 2023) (cleaned up).

Here, Plaintiff pleads unjust enrichment in the alternative "anticipating the possibility Flip might contest the validity of the contract." Opp. at 22. The facts here are similar to those in *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263 (S.D.N.Y. 2023). There, third-

party defendants and a third-party plaintiff disputed the third-party defendants' status as parties to a Sales and Purchase Agreement. Based on their assertion that they were not parties to the contract, the third-party defendants moved to dismiss an unjust enrichment claim against them. The court denied the motion, reasoning that the unjust enrichment claim would only be triggered if no valid and enforceable contract resolved the dispute. *Id.* at 297. And because the Court sustained the contract claims, which would proceed to discovery, leaving the fate of the contract claim as to the third-party defendants uncertain, the court similarly sustained the unjust enrichment claim in the alternative. *Id.*

Here, although Defendant does not seem to contest the validity of the Services Agreement, it does contest Plaintiff's status as to the agreement and Flip's liability to Plaintiff for breach of contract. On this basis, both Plaintiff's breach of contract and alternative unjust enrichment claims may proceed. *See Fly Shoes s.r.l. v. Bettye Muller Designs Inc.*, No. 14-CV-10078 (LLS), 2015 WL 4092392, at *6 (S.D.N.Y. July 6, 2015) (denying defendant's motion to dismiss an unjust enrichment claim where the claim was "made in the alternative to the claim for breach of contract, to the extent that the Court might find that [defendant] did not have contracts with [plaintiff]") (internal citation omitted). This is because, if there is a dispute over "whether the scope of an existing contract covers the disagreement between the parties, a party will not be required to elect his or her remedies and may proceed on both quasi contract and breach of contract theories." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 188 (2d Cir. 2023) (internal citation omitted).

Accordingly, Defendant's motion to dismiss Plaintiff's unjust enrichment claim is denied.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's Amended Complaint

is DENIED. The Clerk of Court is respectfully directed to terminate ECF No. 22.

Dated:  September 29, 2025
        New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge